Claude HOLLAND, Petitioner-Appellant,

v.

Charles J. SCULLY, Superintendent, Green Haven Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents-Appellees.

No. 1364, Docket 86–2100.

United States Court of Appeals, Second Circuit.

Argued May 20, 1986.

Decided July 7, 1986.

Barry Bassis, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City, Phylis Skloot Bamberger, of counsel), for petitioner-appellant.

Ray Cerreta, Asst. Dist. Atty., Kew Gardens, N.Y. (John J. Santucci, Dist. Atty. Queens County, Kew Gardens, N.Y., of counsel), for respondents-appellees.

Before LUMBARD, OAKES and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Claude Holland appeals from an order and judgment of the Southern District, Charles E. Stewart, Jr., *J.* entered on February 11, 1986, denying his petition for a writ of habeas corpus. Holland is currently serving a term of twenty-five years to life for felony murder, having been convicted, along with two co-defendants, after a 1977 jury trial in the New York State Supreme Court, Queens County. In denying the writ, Judge Stewart adopted the Report and Recommendation of Magistrate Michael H. Dolinger, dated September 5, 1985. The district court granted a certificate of probable cause to appeal on March 3, 1986, and this appeal followed.

Holland's petition argues three grounds for granting the writ. First, Holland argues that his sixth amendment rights were violated by admission at his trial of the confessions of his co-defendants whom he could not cross-examine. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Second, Holland argues that the trial court violated his fifth amendment right against self-incrimination by admitting at trial his confession, part of which he alleges to have been taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Third, Holland argues that the trial judge's supplemental instructions to the jury during its deliberations violated his right to a fair trial because the instructions gave the jury the misleading impression that it could convict Holland of the substantive crime of robbery without proof of his intent. Because we agree with Holland's first claim, that his trial was fundamentally tainted under *Bruton* by the admission of his co-defendants' confessions, we remand to the district court with direction to grant the writ unless Holland is retried within a reasonable time.

In May, 1976, Holland's co-defendants and old friends Percy Moore and Richard Payton travelled from Chicago to New York and moved in with him. A month later, on June 25, 1976, Moore and Payton robbed the Van Dam check cashing facility in Long Island City, Queens. In the course of the robbery Moore shot and killed George Caccavalle, an off-duty transit patrolman and owner of the check-cashing business. Holland, Moore, Payton, and a fourth accomplice named Arthur Elliott, were subsequently indicted for first-degree murder, felony murder, first-degree robbery, and possession of a weapon.

Before trial in the State Supreme Court, all four defendants moved for a severance under *Bruton* because the State intended to introduce statements from each of them that might inculpate the others. In addition, all four moved to suppress their own inculpatory statements, under *Miranda*. After nine days of testimony, State Supreme Court Justice Thomas Agresta denied the pretrial motions to the extent that they sought separate trials, holding that severance was not required under *Bruton* because each of the defendants had made statements implicating themselves as well as their co-defendants. Justice Agresta also denied each defendant's request for redaction of incriminating portions of his co-defendants' statements. Finally, he denied all the motions to suppress except as to one statement made by defendant Moore.

Following pretrial hearings, but before trial, Elliott pled guilty to robbery in the first degree and agreed to testify at trial. Holland, Moore, and Payton were tried together, and the jury convicted all three of felony murder on November 16, 1977. On December 14, 1977, the court sentenced Holland and Moore to twenty-five years to life, and Payton to twenty years to life. Elliott received a ten-year sentence on his plea of guilty to robbery.

Through the testimony of eyewitnesses, of Elliott, and of Payton's wife, the State sketched the involvement of all the defendants in the Van Dam robbery. After Moore and Payton moved in with Holland in New York in May, 1976, the three men together visited the Van Dam check-cashing office on several occasions. At trial, Caryl Thompson identified Holland as one of two men who, on June 24, 1976, the day before the robbery, held him up in the elevator of his Brooklyn building; they took his wallet, which contained his drivers' license and other identification.

Elliott testified that on the evening of June 24 he visited the apartment of Holland, whom he knew from work. Holland introduced Elliott to Moore and Payton, and told him that they were planning to rob the Van Dam facility; he asked whether Elliott wanted to make some money. Elliott agreed. He testified that the plan called for him to take his truck and pick up Moore and Payton at 9:00 A.M. the next morning at a designated rendezvous point. Holland would arrive in his own car. The three men told Elliott that Moore and Payton were going to rent a getaway van from Goldie's Leasing, using someone else's driver's license, which they had already obtained. Holland was not supposed to participate in the actual robbery, but was to drive Moore and Payton to the airport after they had divided the loot.

On the morning of June 25, Holland dropped Moore off near Goldie's. Moore rented a van, using the stolen identification papers, and provided Goldie's with a telephone number which later turned out to be Holland's. Moore and Payton drove the

van to the Van Dam facility in Long Island City, Queens. By 9:00 A.M., a number of people were waiting outside. Demary Alicea, one of the Van Dam employees who opened up that morning, testified that she saw a red Goldie's van parked outside the office, with a man sitting in it whom she identified at trial as Moore. Three other witnesses also saw the van parked outside the facility, with one or two men sitting in it.

Shortly after the store opened, George Caccavalle, an off-duty transit detective who regularly delivered the Van Dam cash payroll, arrived with the cash for the week. As he carried some of the money in a canvas bag from his car to the store, he was struck by three or four gunshots. After Caccavalle fell to the ground, the gunman took the money bags, jumped in the Goldie's van, and drove off.

By the time of the shooting, just after 9:00, Elliott had arrived at the designated meeting point. He saw Holland sitting in his car about half a block away and waved to acknowledge his presence. By 9:05 or 9:07, Moore and Payton had arrived in the red Goldie's van. Leaving the van behind, the two men got into Elliott's truck, carrying what appeared to be a money bag. Elliott then drove to his mother-in-law's house in Brooklyn, with Holland following in his own car.

According to Elliott, the four men entered the house and went upstairs. Elliott kept watch out of the window of one room, while the three men were in a back room counting the money. About ten minutes later, Holland told Elliott that the robbers had recovered $33,000, and gave him $3,000 of it. Holland, Moore, and Payton each received $10,000. At some point Holland went to his car, and brought back a suitcase that contained changes of clothes for Moore and Payton. Elliott then departed, and was told that Holland was going to drive Moore and Payton to the airport.

The next morning, after reading about the robbery in the newspaper, Elliott called Holland and told him that the person shot in the robbery was a police officer and that

he was dying. Elliott testified that Holland's answer was that he was "sorry it was a cop, it [is] going to bring a lot of heat." Caccavalle died that day of injuries resulting from the gunshot wounds. Shirley Payton testified that Payton discussed the facts of the robbery with her, and that she saw Holland with her husband in Chicago a week later.

*Holland's Statements*

A number of police officers testified to inculpatory statements made by Holland in the course of investigations. Holland's phone number appeared on the Goldie's rental slip and the police first questioned him on June 28, 1976. Holland could not explain why his number was on the slip, but showed police his business card to demonstrate that many people had access to the number.

On July 19, 1976, Shirley Payton contacted the New York City police and gave a taped interview. Two days later, the police arrested Holland at his workplace and read him his rights. They took him to the 114th Precinct, where Detective Delphin Greene again gave him the *Miranda* warnings. Holland said that he was willing to answer questions. He admitted that he had known about the robbery because his friends "Richard and Percy" from Chicago had planned it at his house. Although he denied having been at the scene "when the robbery went down," he admitted that he met them after the crime and accompanied them to Elliott's mother-in-law's house. Greene testified that Holland admitted that they had "split up the money." Holland also admitted that he threw the money bag containing Moore's and Caccavalle's guns into a sewer in front of a church on Washington Avenue. Holland then agreed to make a statement to an Assistant District Attorney.

Later that night, A.D.A. Albert Gaudelli took a taped statement from Holland, after advising him of his rights. In answer to a series of Gaudelli's questions, Holland stated that Moore and Payton were old friends from Chicago who had come to visit him about a month before the robbery. The

two men accompanied Holland to Van Dam several times when he cashed his checks and, about three weeks before the robbery, told him that they might rob the facility. On June 24, 1976, in a conversation in front of Elliott, Moore and Payton told Holland that they were planning the robbery for the following morning, and that the plan called for them to shoot the man carrying the money so that he would drop his gun.

The two men, Holland continued, said that they needed a van for the hold-up, and asked where they could rent one. He said he usually rented from Goldie's Leasing. They asked if he could drop them off at Goldie's the next morning on his way to work, and he agreed. According to Holland, during the conversation Moore told him that he and Payton "had took" a license from someone in Brooklyn and were going to use it to rent the van; Holland remembered the name on the license as "Carl." He also admitted that he drove Moore to Long Island City the next morning at 7:00 A.M.

Although Holland denied any participation in the robbery, he did admit that he had some additional involvement after the fact. First, he discussed the robbery with Payton shortly after it occurred, and Payton told him that, during the robbery, Moore had shot Caccavalle several times because he tried to raise his gun. Holland also discussed the robbery with Elliott at that time, who said that Caccavalle's death would "bring a lot of heat." Holland admitted calling Payton on June 27 to tell him that Caccavalle was a police officer, during which conversation Payton told him that the robbery had netted $33,000, and that $3,000 had gone to Elliott for driving Moore and Payton to the airport. Finally, Holland admitted that on July 17, four days before his arrest, he spoke with Moore and requested money from him in return for his silence and because he needed to get a lawyer.

At the end of the tape, Holland told Gaudelli that he wanted to talk to a lawyer. Gaudelli left Holland alone, and about twenty minutes later (at approximately 11:45 P.M.) Detective John Daly placed a Yellow Pages in front of Holland, opened to "Lawyers." Daly testified that Holland then asked him what the directory was for, and he replied that Gaudelli had told him that Holland wanted a lawyer. Holland then supposedly said "I don't really want a lawyer, I am going to get one in court." Daly responded that he wanted to ask Holland questions and that Holland was entitled to get a lawyer. Daly testified that Holland repeated "I'll get one in court."

Daly testified that, after he again advised Holland of his rights, he accused him of having lied during the taped interrogation. According to Daly, Holland then dropped his head and said "Now I'm going to get involved." When Daly said he believed that Holland had received money from the robbery, Holland admitted getting a $10,000 share. Holland also admitted placing Moore's and Caccavalle's guns into the money bags and throwing them into a sewer in front of a church on Washington Avenue in Brooklyn. This admission coincided with one of the statements he had supposedly made originally to Detective Greene.

Daly and other police witnesses testified that the police subsequently searched the sewers near the church on Washington Avenue, but could not find the bag. As a result, they took Holland to the site and he directed them to the correct sewer where, the next day, the police retrieved the two guns and the money bag.

*Payton's and Moore's Statements*

Payton and Moore each gave statements to Detective Daly the morning after their arrest, in Chicago, on July 21, 1976. These statements, which had been transcribed by a court reporter, were received into evidence over Holland's *Bruton* objection.

Payton stated that, about two weeks before the robbery, Elliott brought up the idea of robbing the Van Dam facility. Payton said that he, Elliott, Moore, and Holland all had originally planned to commit the robbery on June 11, 1976, but had to call of the robbery that day because the money courier was unexpectedly carrying a

gun. The following week, they tried again, but arrived too late and missed the delivery of the payroll.

Payton stated that Holland and Moore had obtained a driver's license from someone just prior to the third attempt. On the morning the robbery finally took place, June 25, Payton met Holland and Elliott at their workplace while Moore rented the van. Holland then drove Payton to a location near the Van Dam facility, where Moore awaited with the van. Payton got behind the wheel of the van, and Holland then drove off; Payton stated, however, that Holland drove by several times while Moore and Payton waited in the parked van. When Caccavalle arrived with the money bags, Moore got out of the van, shot him three times, grabbed the bags, and jumped back into the van. Payton then drove to the prearranged meeting-place, where Holland and Elliott awaited.

Payton went on to state that, at that point, he and Moore abandoned the van and got into Elliott's truck, while Holland left in his own car. They all drove to Elliott's mother-in-law's house, where they counted and divided the money. According to Payton, he, Moore, and Holland each received $10,000, and Elliott was given $3,000. After Moore and Payton changed their clothes, Holland drove them to Newark airport, where they took a flight to Chicago. Holland was supposed to dump the money bag and the guns into the Atlantic Ocean. Payton's statement concluded by recounting that Holland had visited him in Chicago on July 17, asking for money to hire a lawyer.

Moore's statement to Detective Daly was substantially similar to Payton's. He said that in May, 1976, Holland had called to say that he "had something nice"—Moore assumed this referred to a money-making deal. Moore and Payton went to New York in June, and stayed with Holland until the robbery. They stole some furs, but, because this did not produce much money, began to consider holding up the Van Dam check-cashing facility; they cased the office once or twice in preparation. In addi-tion, according to Moore, he and Holland robbed a man of his identification papers for use in the crime. Moore's account of the robbery, the shooting, and the division of the loot parallelled Payton's. He stated that he never spoke to Holland again after Holland drove Moore and Payton to the airport.

None of the defendants testified at trial, and Holland called only one witness, Detective John O'Connell. O'Connell testified that he had spoken to Holland in July, 1976, and Holland had at that time denied participating in the robbery.

In his summation, the prosecutor encouraged the jury to consider the statements of Moore, Payton, and Holland as a group against the defendants, arguing that any credibility concerns the jury might have should be alleviated by the statements' mutually supportive framework. He also dwelled on Holland's role as the "mastermind" of the robbery, citing as proof facts contained exclusively in the statements of Moore and Payton. In conclusion, he urged the jury to bring in guilty verdicts against the three defendants who, unlike Caccavalle, were not "citizens of this community"—presumably lumping together Payton, Moore, and Holland (who was a New York resident).

The court's charge gave the jury limiting instructions on the use of the co-defendants' statement and emphasized that the People had the burden of proving all the elements of the crime beyond a reasonable doubt. Justice Agresta went on to detail the nature of the intent required to convict the defendants of the crimes charged, and gave particular emphasis to the definition of "acting in concert," which is a prerequisite to a conviction for aiding and abetting. After several hours of deliberation, at 10:55 P.M., the jury sent two notes to the court, both of which bore on the guilt or innocence of Holland.

The first note read:

Would a person be acting in concert even if he helps in the commission of a crime

without intent receiving [sic] personal benefits from the crime?

Justice Agresta responded:

It makes no difference what his intent was. If he is acting in concert, he is equally liable with everybody else.

The second note read:

Would a person be acting in concert if he ... had knowledge of a crime, without reporting it to the proper authorities?

Justice Agresta responded:

It has nothing to do with the case whether he reports it to the authorities or not. You must determine whether the individuals were acting in any way either in the participation of the crime or benefitting from the crime; that's your responsibility in determining the innocence or guilt of each of the defendants.

After the jury went back to deliberate, Holland objected unsuccessfully to both supplemental instructions. The jury was sequestered for the night, and after deliberating the following morning, convicted the three defendants of felony murder. On December 14, 1977, Justice Agresta sentenced Holland and Moore to indeterminate prison terms of 25 years to life, and Payton to a term of twenty years to life. All three men are currently serving their sentences.

Holland appealed to the Appellate Division, Second Department, raising two claims: 1) that the introduction of his co-defendants' statements at trial had violated his sixth amendment right to confrontation under *Bruton*, and 2) that the supplemental instructions by Justice Agresta erroneously eliminated intent as an element of the substantive offense. The Appellate Division affirmed without opinion on February 23, 1981. *See People v. Holland*, 80 A.D.2d 753, 437 N.Y.S.2d 214 (2d Dep't 1981). The New York Court of Appeals denied leave to appeal on April 30, 1981.

In May, 1982, Holland moved pro se before Justice Agresta to vacate his conviction pursuant to N.Y.C.P.L. § 440.10. He asserted three grounds to vacate: 1) that he had been arrested in violation of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct.

2248, 60 L.Ed.2d 824 (1979), and that any resultant statements he made should have been suppressed; 2) that his inculpatory statements had been obtained in violation of his right to counsel and his right against self-incrimination; and 3) that the joint trial and the admission of all the defendants' statements had violated *Bruton*. On June 14, 1982, Justice Agresta ruled that Holland's motion was procedurally barred under N.Y.C.P.L. § 440.10(2)(a) and (2)(c), because the claims either had been or should have been raised on direct appeal to the Appellate Division. On September 24, 1982, the Appellate Division denied Holland leave to appeal the June 14 decision.

On February 15, 1983, Holland filed a pro se motion in the Appellate Division for reargument and reconsideration of his direct appeal, pursuant to N.Y.C.P.L. § 470.-50. He argued that his appellate counsel had been ineffective because he failed to raise two meritorious issues on appeal. One of these, which trial counsel had raised and which Justice Agresta had denied in pre-trial proceedings, was that Holland's statements to Detective Daly following his request for a lawyer were inadmissible under the fifth amendment and under *Miranda*. On July 6, 1983, the Appellate Division summarily denied Holland's motion. On October 12, 1983, the New York Court of Appeals dismissed as untimely Holland's request for reconsideration of the court's earlier denial of leave to appeal his direct case, and also denied his request for leave to appeal the Appellate Division's ruling on the motion to reargue on the ground that such a ruling is not appealable under N.Y.C.P.L. § 460.20.

On January 6, 1984, Holland filed a pro se habeas corpus petition in the Southern District, and counsel was assigned. Holland filed an amended petition on September 4, 1984, which argued three points. First, he argued that the introduction of inculpatory statements by Holland's co-defendants, the prosecutor's use of those statements, and the trial court's refusal to grant a severance or to redact incriminating portions of the statements violated Holland's constitutional right to confront

and to cross-examine his accusers. Second, he argued that the introduction of Holland's statements to Detective Daly violated his rights under the fifth and sixth amendments. Third, he argued that Justice Agresta's supplemental instructions on acting in concert violated Holland's due process right to a fair trial because they eliminated from the jury's consideration the element of intent needed to support a conviction for aiding and abetting.

On September 5, 1985, the Magistrate issued his Report and Recommendation, which suggested that the district court deny the petition. The Magistrate began by noting that Holland had exhausted all of these claims in the New York state courts, and therefore the district court was empowered to consider the petition on collateral attack. As to the first claim, the Magistrate concluded that there had been a *Bruton* violation, but that it constituted harmless error. The Magistrate next concluded that, although all the claims were properly exhausted, consideration of the *Miranda* claim was nonetheless barred, under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), because of Holland's procedural default in the state courts. Finally, the Magistrate argued that the supplemental jury instructions, though problematic, did not amount to a due process violation in the context of the court's charge. In an opinion dated February 11, 1986, the district court adopted the Magistrate's recommendation and denied the petition. Holland appealed. We reverse in part and remand because we believe that the trial was infected with a serious *Bruton* violation which, in the circumstances, and in light of the Supreme Court's recent decision in *Lee v. Illinois*, — U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), cannot be considered "harmless error."

*Exhaustion*

Respondents argue that Holland has failed to exhaust his state remedies with respect to his third claim, which asserts that the trial court's supplemental instructions violated due process by removing the issue of Holland's intent from the jury's consideration. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Although Holland did challenge these instructions on appeal in the state court, his claim there alleged only that the instructions violated the state statutory requirements for proving aiding and abetting; consequently, respondents argue that the state courts were not sufficiently alerted to, and could not have resolved, the federal constitutional aspect of Holland's claim. *See Daye v. Attorney General of New York*, 696 F.2d 186, 191–92 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). If the State were correct that Holland has failed to exhaust his third habeas claim, we would be compelled to remand the *entire* case to the district court with direction to dismiss. *See Rose v. Lundy*, 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982). Holland would then have the option of returning his entire case to the state courts, or of deleting his instructions claim and bringing the petition again in the district court. *See Petrucelli v. Coombe*, 735 F.2d 684, 690 (2d Cir.1984). We agree with the district court that Holland exhausted his remedies in the state courts; in light of our holding on the *Bruton* claim, however, we do not address the merits of the claim that the court's supplemental instructions were faulty.

Although Holland's state appellate brief did not explicitly argue that the supplemental instructions ran afoul of due process, we have held that a habeas petitioner's federal constitutional claims may be considered exhausted when the claims were "fairly"—though not explicitly—presented to the state courts. *See Daye, supra*, 696 F.2d at 191; *see also Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). According to *Daye*, there are four primary sets of circumstances in which a habeas petitioner may be said to have adequately alerted the state courts to the constitutional nature of his claims:

65

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

696 F.2d at 191. Holland argues that he falls within the last of these categories, because the discussion of the supplemental instructions in his state appellate brief clearly called to mind the constitutional axiom that no person may be deprived of liberty without proof, beyond a reasonable doubt, of every fact necessary to constitute the crime of which he is accused. *In re Winship, supra,* 397 U.S. at 364, 90 S.Ct. at 1072; *Davis v. United States,* 160 U.S. 469, 493, 16 S.Ct. 353, 360, 40 L.Ed. 499 (1895).

Holland's brief to the Appellate Division argued that Justice Agresta's supplemental instructions failed to comport with New York's aiding and abetting statute, N.Y. P.L. § 20.00, which requires that the People prove "both the intent to commit the crime and actions in furtherance of that crime...." Holland's brief did not challenge the instructions under the federal or state constitutions, nor did it cite the New York law requiring proof beyond a reasonable doubt of all elements of the crime, *see* N.Y.C.P.L. § 70.20. It did not even cite any of the many New York cases establishing the right to have the prosecution prove every element of the offense. *See, e.g., People v. Newman,* 46 N.Y.2d 126, 128, 412 N.Y.S.2d 860, 385 N.E.2d 598 (1978); *People v. Patterson,* 39 N.Y.2d 288, 301, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976).

■ Nevertheless, we agree with the district court and the Magistrate that the facts alleged in Holland's brief should have called to mind fundamental due process principles. Holland's statutory argument noted that intent was a necessary element of liability as an accessory, and claimed that the supplemental instructions had re-

moved intent from the jury's consideration. This factual pattern falls so squarely within the fundamental due process rule that the prosecution prove every element of the offense, *see Francis, supra,* 471 U.S. ——, 105 S.Ct. at 1970, that "no reasonable jurist could doubt that the defendant's claim implicated [a] constitutional right," *see Daye, supra,* 696 F.2d at 193. In light of the fourth criterion in *Daye,* Holland must be said to have adequately alerted the state court to his constitutional claims, and therefore the claim has been exhausted. *Id.* at 196–97.

We disagree with the State's argument that this case is governed by our decision in *Petrucelli, supra,* where a habeas petition was dismissed as unripe because the defendant had not adequately alerted the state courts to the constitutional aspects of his claim. *See id.,* 735 F.2d at 690. In *Petrucelli,* the defendant's arguments to the state courts merely intoned vague allegations that he had been denied a "fair trial" and "due process," but failed to mention that the double jeopardy clause provided the specific basis for his constitutional attack. *See id.* at 688–89. We held in *Petrucelli* that this kind of talismanic argumentation had been the subject of our precise disapproval in *Daye, see id.,* 696 F.2d at 193 (noting that "fair trial" claim would, taken alone, be overly vague), and accordingly dismissed the petition. Holland, by contrast, presented the state courts with a factual pattern that should have called to mind a *specific* constitutional challenge—that is, elimination of a requisite element of the crime alleged, in violation of the due process clause. Consequently, this case is distinguishable from, and is not governed by, our decision in *Petrucelli.*

### Bruton Violation

Holland claims that the trial court's refusal to grant a severance, combined with the admission at trial of the statements of his nontestifying co-defendants, violated his sixth amendment right of confrontation under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The *Bruton* Court held that limiting instructions are inadequate to guard against the suspect credibility and potentially devastating prejudice arising from use of a co-defendant's inculpatory statements in a joint trial, when the co-defendant cannot be cross-examined. *See id.* at 135–36, 88 S.Ct. at 1627–28. The trial court here nevertheless admitted the statements of Moore and Payton on the authority of the so-called "interlocking confessions" exception to *Bruton* that we originally articulated in *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296, 300 (2d Cir.1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970). The trial court found the rationale of the interlocking confessions exception—that the "devastating" impact of a co-defendant's statements is absent or minimized when the defendant himself confesses—warranted admission of the statements against Holland. *See, e.g., United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 48–49 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975).

Holland points out, however, that although confessions need not be identical in all respects to be interlocking, *see Stanbridge, supra,* 514 F.2d at 49, they must at a minimum be "substantially the same and consistent on the major elements of the crime involved," *Tamilio v. Fogg,* 713 F.2d 18, 20 (2d Cir.1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984); *see also United States ex rel. Ortiz v. Fritz,* 476 F.2d 37, 39 (2d Cir.) (interlocking confessions must be the same "[a]s to motive, plot and execution of the crime"), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973). Our traditional requirement that interlocking statements be identical on all key points comports with the recent decision in *Lee v. Illinois,* — U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), in which the Supreme Court rejected an application of the interlocking confessions exception. The *Lee* Court cautioned that "[i]f those portions of the co-defendant's purportedly interlocking statement which bear to any significant degree on the defendant's participation in the crime are

not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment." —— U.S. at ——, 106 S.Ct. at 2063–66.

■ Under our traditional interpretation of the interlocking confessions rule, and in light of the *Lee* decision, we agree with the district court that Holland's trial was infected by a serious *Bruton* violation. Although Holland's confession was similar to that of Moore and Payton in detailing many of the facts surrounding the Van Dam robbery, nowhere in his confession did Holland ever admit that he induced his co-defendants to commit—or even that he participated in the planning of—the crime. Thus, taken alone, Holland's confessions would certainly have been sufficient to convict him of the lesser offense of criminal facilitation. *See* N.Y.P.L. § 115.05. It is not at all clear, however, whether the jury would have inferred from Holland's statements the mental culpability necessary to convict him of aiding and abetting under N.Y.P.L. § 20.00, which in turn established his *personal* liability for the offense that he allegedly solicited—felony murder.

By contrast, Moore and Payton both testified that Holland was the mastermind, and had invited them to New York with the purpose of having them commit the robbery. Their damning testimony played a primary and essential role in making the case for aiding and abetting against Holland. This case is strikingly similar to *Lee,* in which the Court held that confessions cannot interlock when they diverge on matters as central as the defendants' various roles in the planning of the crime. *See* —— U.S. at ——, 106 S.Ct. at 2066. In remanding the defendant's conviction, the *Lee* Court stated that, whereas the defendant's confession alone would have rendered her liable for voluntary manslaughter, the admission of her co-defendant's statement added the element of premeditation and thus made out a case of murder. The Court held that Lee's trial had therefore violated the Sixth Amendment: "[W]hen

the discrepancies between the [supposedly interlocking] statements are not insignificant, the codefendant's confession may not be admitted." —— U.S. at ——, 106 S.Ct. at 2066; *see United States v. Paternina-Vergara,* 749 F.2d 993 (2d Cir.1984).

The State argues, however, that any *Bruton* violation at Holland's trial constituted harmless error, because there was sufficient evidence to convict him whether or not the trial court had admitted the statements of Moore and Payton. Magistrate Dolinger agreed that the error was harmless, stating that in his view there was enough other evidence against Holland that an average jury would not have " 'found the state's case *significantly* less persuasive [absent the improper evidence].' " *See* Appendix at C. 39 (*quoting Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972)). We believe, however, that the Magistrate, and consequently the district court, misconstrued *Schneble* and as a result used an improper standard to determine whether an error can be considered harmless.

In our view, the central point of *Schneble* is that a trial error cannot be "harmless" if there "is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Id.,* 405 U.S. at 432, 92 S.Ct. at 1059. Indeed, the Court reaffirmed this rule recently in *Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674, (1986), in which the Court (per Rehnquist, J.) held that "harmless error" means "harmless beyond a reasonable doubt." *Id.* at ——, 106 S.Ct. at 1435. Our decisions are in accord with *Schneble* and *Van Arsdall.* In *Anderson v. Smith,* 751 F.2d 96 (2d Cir.1984), we remanded the defendant's conviction because of a constitutional trial error, noting that the error could only have been harmless if the other, proper, evidence against the defendant had been "overwhelming." *Id.* at 105–06.

■ Applying the *Van Arsdall* standard to Holland's case, we cannot say that the *Bruton* error was harmless beyond a reasonable doubt. Considered apart from the statements of Moore and Payton, the State's case against Holland for aiding and abetting was far from overwhelming. First, Holland's confessions admitted only the elements of the lesser crimes of criminal facilitation or hindering prosecution, *see* N.Y.P.L. §§ 115.05, 205.50, but consistently denied any intent to solicit or to participate in the crime, which is a prerequisite to a conviction for aiding and abetting under New York law. *See, e.g., People v. Clarke,* 43 A.D.2d 834, 351 N.Y.S.2d 14 (2d Dep't 1974) (defendant's knowledge of a robbery that resulted in felony murder, his supplying gun, and his cutting the robber's hair, were sufficient only for criminal facilitation or hindering prosecution but not for aiding and abetting). It is the purest speculation whether the jury would have inferred, from Holland's admitted marginal involvement in the robbery, his intent to be a participant.

Second, Elliott's testimony implicating Holland in the planning of the robbery directly contradicted Holland's statements, and Elliott's credibility as a witness was not at all clear. In this regard, we are particularly mindful of the *Lee* Court's recent discussion of a "reality of the criminal process, namely that once partners in crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Id.,* —— U.S. at ——, 106 S.Ct. at 2063. The third major piece of evidence that the State offered against Holland was Caryl Thompson's testimony that he had been robbed of his identification on June 24, 1976, and his in-court identification of Holland as one of the robbers. Even assuming that the jury believed that Thompson had correctly identified Holland, his participation in the earlier robbery showed only circumstantially that he intended to participate in the second one.

We believe that the prosecution removed all doubt that the *Bruton* violation could be considered harmless when it belabored to the jury the "interlocking" nature of the confessions. In his summation, the prosecutor at great length surveyed the evidence supposedly showing Holland to be the

"mastermind" of the crime, most of which derived exclusively from the statements of Moore and Payton. Over defense objections, the prosecutor often used Holland's co-defendants' statements to support the credibility of other witnesses such as Elliott and Thompson. And repeatedly in his summation, the prosecutor urged the jury to "[e]xamine these statements of Percy Moore and Richard Payton" as they tended to prove Holland's role in planning the Van Dam robbery. We have previously considered this kind of argumentation in a case involving the interlocking confessions exception to *Bruton,* and strongly cautioned the prosecution not to increase the possibility of prejudice by "disregard[ing] the instructions and urg[ing] the jury to convict one defendant *because* his co-defendant has confessed." *Kirksey v. Jones,* 673 F.2d 58, 60 (2d Cir.1982).

The prosecutor's direct and indirect exhortations that the jury consider Moore's and Payton's statements against Holland magnified the dangers of permitting such statements in evidence at all; these dangers were doubly compounded in this case, which involved the factually overlapping confessions of *two* co-defendants. It strains our credulity to believe that, in the circumstances, the jury could fairly evaluate the defendants' differing versions of the Van Dam robbery, and accordingly we are unable to conclude that the *Bruton* error was harmless beyond a reasonable doubt—the writ must be granted. *See Van Arsdall,* —— U.S. at ——, 106 S.Ct. at 1435–38; *cf. Lee, supra,* —— U.S. at ——, 106 S.Ct. at 2063 (noting that use of the interlocking confessions exception is particularly suspect where there is a strong likelihood that the factfinder considered a defendant's statement against his co-defendant). As Judge Friendly stated, reversing convictions in a similar trial: "It is impossible realistically to suppose that when the twelve good men and women had [one defendant's] confession in the privacy of the jury room, not one yielded to the nigh irresistible temptation to fill in the blanks with the keys [the other defendant] had

provided...." *United States v. Bozza,* 365 F.2d 206 (2d Cir.1966).

### Miranda Claim

Holland claims that the admission into evidence of the last of his three inculpatory statements, made to Detective Daly, violated his fifth amendment right against self-incrimination under *Miranda v. Arizona,* 384 U.S. 436, 474–75, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966), because the statement was made after Holland had invoked his right to counsel. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (restricting admissibility of confessions after right to counsel has been invoked); *People v. Cunningham,* 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980) (same). The district court adopted the Magistrate's view that the court was precluded from considering the claim on the merits because Holland had failed to raise the issue on his direct appeal in the state courts. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). We agree.

Holland's *Miranda* claim was not, but should have been, raised on Holland's direct appeal to the Appellate Division. This constituted a waiver under New York law, *see* N.Y.C.P.L. § 440.10(2)(c), and accordingly the trial court declined to reach the claim when it considered Holland's post-appeal motion to vacate. Holland argues, however, that he subsequently raised the *Miranda* issue on his motion for reargument to the Appellate Division, as a component of his argument that he had had ineffective assistance of counsel on his original appeal.

Holland's view is problematic, however, because there is no indication that the Appellate Division in fact reached the merits of the *Miranda* claim. Although Holland had missed the 30-day deadline for the motion to reargue, *see* 22 N.Y.C.R.R. § 670.5, under N.Y.C.P.L. § 470.50 the Appellate Division could nevertheless have ordered reargument if it would have been in the "interest of justice" to do so, and if the deadline had been missed for "good cause" —which "cause" may include incompetence

of counsel. *See id.* Holland argued that his counsel had been incompetent, based in part on the failure to raise the *Miranda* claim; the State opposed solely on the procedural ground, and did not argue the merits of the *Miranda* claim. The Appellate Division denied Holland's motion without opinion. As Magistrate Dolinger noted, the Appellate Division's summary denial may well have been based solely on its recognition of the limited scope of the "interest of justice" jurisdiction; thus the court was not at all required to address the *Miranda* issue. *See Martinez v. Harris*, 675 F.2d 51 (2d Cir.) (establishing presumption that summary denial was based on procedural grounds), *cert. denied*, 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982).

Further, as the Magistrate pointed out, accepting Holland's view would undermine the procedural bar rule of N.Y.C.P.L. § 440.10(2)(c), recognized and given force on habeas review under *Wainwright.* A defendant who failed to raise an issue on direct appeal could at any subsequent point assert it in an untimely motion for reargument in the state appellate court, as a component of an argument that his counsel's incompetence was the "good cause" for his failure to comply with the 30-day deadline. Therefore, because we conclude that Holland failed to adjudicate his *Miranda* claim in the state appellate court, we are barred by *Wainwright* from considering the claim on habeas review, absent "cause" and "prejudice." *See Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

The Magistrate found that Holland had demonstrated no "prejudice" from admission at trial of the confession allegedly taken in violation of *Miranda*, and consequently argued that habeas consideration on the merits was barred. Because the Magistrate disposed of the claim on the basis of the lack of prejudice, he recommended that the court make no ruling on Holland's argument that his counsel's incompetence constituted the "cause" under *Wainwright* for the failure to raise the *Miranda* claim on direct appeal. *See Strickland v. Washington*, 466 U.S. 668,

696–99, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674 (1984) (although counsel's incompetence can be "cause," court should avoid such a finding if claim can be decided on basis of "prejudice"). The district court, though purporting to adopt the Magistrate's opinion, suggested that Holland had failed to show *both* "cause" and "prejudice." In any event, we agree that the admission of the third confession did not "prejudice" Holland as that term has been construed, and thus we do not rule on whether Holland's state appellate counsel had acted with incompetence sufficient to constitute "cause."

Unlike the test for harmless error, the test for "prejudice" sufficient to overcome a procedural default requires the petitioner to show that the error of which he is complaining on habeas "worked to his *actual and substantial disadvantage*, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982). Holland argues that the third statement, which presents the *Miranda* issue, contained the highly damaging admissions that he had received a $10,000 share of the robbery proceeds, and that he had hidden the guns and the money bag in a sewer. Holland overlooks, however, that his first uncontested statement to Detective Greene also contained admissions that he had hidden the guns and the bag, and that he had shared in the proceeds of the robbery; further, Elliott testified that Holland had received $10,000 from the robbery. Because the third statement added no facts that were not already in evidence from undisputedly proper sources, the admission of the statement was not "prejudicial." *See Forman v. Smith*, 633 F.2d 634, 642 (2d Cir.1980) (noting that prejudice depends primarily on whether other evidence established key facts at trial).

Because we believe that Holland has failed to show that he was "prejudiced" under *Wainwright* by the admission at trial of his third confession, we agree with the district court that his procedural default in the state court bars us from consid-

**70**

ering the merits of the *Miranda* claim on habeas review.

*Supplemental Instructions Claim*

Holland argues that Justice Agresta's responses to the jury's questions during deliberations violated his due process right to a fair trial, because these supplemental instructions gave the jury the erroneous impression that they could convict Holland of aiding and abetting a robbery without proof of his intent. The Magistrate found that the instructions were misleading and technically incorrect, but nevertheless concluded that, when seen in the context of the court's charge and the jury's deliberations, they did not so infect the trial process that the result violated due process. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01 (1973). We have noted that we agree with the Magistrate that this claim was exhausted in the state courts, and thus can be considered on the merits. Because we grant the writ based on the *Bruton* violation that tainted Holland's trial, however, we need not reach the merits of the supplemental instructions claim.

*Conclusion*

We believe that the admission of the statements of his co-defendants violated Holland's sixth amendment rights under *Bruton,* and that the violation cannot be considered harmless error in the circumstances. Accordingly, we remand Holland's conviction with a direction that the district court grant the writ of habeas corpus unless Holland is retried within a reasonable time.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.