Carlos **FIGUEROA**, Petitioner,

v.

Leonard **PORTUONDO**, Superintendent Shawangunk Correctional Facility, Respondent.

No. 97 Civ. 2920(AKH).

United States District Court, S.D. New York.

Nov. 10, 1999.

258

Norman L. Reimer & Susan J. Walsh, Gould, Reimer & Gottfried, New York City, for petitioner Carlos Figueroa.

Robert T. Johnson, District Attorney, Bronx County, by Stuart P. Levy & Robert F. Petrone, Assistants District Attorney, for respondent Leonard Portuondo.

## OPINION

HELLERSTEIN, District Judge.

On July 8, 1981, Carlos Figueroa, the Petitioner, and two others were convicted after trial in the Supreme Court, Bronx County, of holding up a gasoline station and the killing of its owner. Petitioner, however, was not identified by witnesses as having taken part in the robbery or homicide, and no physical evidence linked him to the crime. The sufficiency of the real and testimonial evidence was questionable. Petitioner made three statements that placed him at the scene of the crime, but he denied active and willing participation in either the robbery or the shooting. The jury was able to convict him because the redacted confessions of a non-testifying co-defendant necessarily implied his participation.

*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), established the Constitutional principle that it is improper to prove one person's guilt by introducing into evidence an out-of-court confession of a co-defendant. The prejudicial effect is so great, the Supreme Court held, that a jury cannot be expected to heed a cautionary and limiting instruction. That effect was produced in this case. And as this case shows, an ineffec-

tively redacted confession created the very prejudice that *Bruton* sought to prevent.

The conviction in this case is nineteen years old, and Respondent raises both a statute of limitations and a laches defense. But the statute of limitations issue has been resolved against Respondent's position[1], and the laches defense suffers from a failure to show specific prejudice by virtue of the delay. Thus, my duty is to apply the United States Constitution to this case regardless of how long ago the conviction occurred. State court convictions and considerations of federalism must be respected, *see, e.g., Daye v. Attorney General of the State of New York,* 696 F.2d 186, 191 (2d Cir.1982) (en banc), but there cannot be compromise to the Constitutional requirement of a fair trial, *see, e.g., Klein v. Harris,* 667 F.2d 274, 292 (2d Cir.1981) (Kaufman, J., concurring).

I hold, therefore, pursuant to 28 U.S.C. § 2254, that a writ of habeas corpus should issue, that the defenses of limitations and laches do not apply, and that state remedies have been exhausted. Petitioner was convicted on the confessions of a non-testifying co-defendant, for the failed redactions of those confessions pointed inexorably to Petitioner's participation in the felony murder. Without those confessions, it is doubtful that the jury would have convicted Petitioner. The Sixth Amendment to the United States Constitution, guaranteeing fair trial and confrontation of witnesses, was violated and Petitioner's conviction must therefore be vacated.

## I. *Facts*

### A. *Overview*

On or about December 9, 1980, Hector Rivera, Raymond Bermudez, and Petitioner, Carlos Figueroa, were indicted, and in June 1981 the three were tried and convicted of felony murder. On August 19, 1981, Petitioner was sentenced to a term of 25 years to life imprisonment. *See* Petition for a Writ of Habeas Corpus, April 11, 1997, ¶¶ 2–3 ("Petition"). The facts, as the prosecutor told the jury in his opening statement, were as follows.

In the early morning hours of October 3, 1980, a red Vega, driven by co-defendant Bermudez, and occupied by Petitioner, co-defendant Rivera and a fourth man, Tony Colon, drove into a Shell gas station on Bruckner Boulevard in the Bronx.[2] An unidentified number of men got out, and went inside the gas station office to ask for change for a cigarette machine. Other customers were in the office, along with Louis Martinez, the night manager, and Gilbert Ortiz, a gas station attendant, and the men returned to their car.

A short time later, the red Vega returned for gas. Three men armed with pistols exited the car, charged into the office, struck the attendant Ortiz on the head, and took cash from the register. The perpetrators searched for a safe, threatened Martinez and Ortiz with their lives, and eventually found a safe. At that point, co-defendant Rivera drove a second car, a tan 1972 Oldsmobile, into one of the gas station bays, and two of the perpetrators dragged the safe to the car while another guarded Martinez and Ortiz at gunpoint. Another person, a witness to the event, Bernard O'Hara, on his way home from a baseball game, pulled into the station to ask for directions, was confronted by one of the perpetrators, and was forced into a rear locker room. The perpetrators then broke into O'Hara's car and found a .22 caliber pistol under his seat.

The owner of the gas station, William Hendricks, drove by, came into the office, and was struck by a perpetrator on the back of his head. As he fell, he reached for a .38 caliber pistol in his ankle holster, but one of the perpetrators shot him first. Hendricks, however, managed to fire his gun and struck Martinez in the hand.

---

**1.** *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), discussed later.

**2.** Tony Colon was never apprehended and was not a co-defendant in Petitioner's trial.

Bermudez returned to the office, saw Hendricks lying on the floor, and grabbed Hendricks' .38 caliber gun. The perpetrators fled; Martinez ran to stop a car for help; and O'Hara emerged from the rear locker room to find Hendricks lying on the ground, dead.

## B. *The Severance Motions*

Based on pre-trial statements made by each co-defendant, and indications that none would be a witness at trial, Figueroa, Rivera and Bermudez, relying on *Bruton*, moved for separate trials. (Tr. 2–6). On June 15, 1981, the Court held a hearing. (Tr. 1–15). Petitioner Figueroa argued that he was entitled to a separate trial because his statements showed only his presence at the scene, and not that he participated in either the robbery or the shooting. (Tr. 10). The People opposed, arguing that each defendant "confessed to substantially the same thing." (Tr. 12). The Court denied the severance motions, ruling that redactions of the statements would prevent the statements of each from implicating any other defendant. (Tr. 14–15).

## C. *The People's Case in Chief*

The People presented three eyewitnesses to the robbery and murder, the policemen who arrived at the scene, and redacted statements from two defendants. I discuss each category of proof below.

### 1. *The Testimony*

The prosecution first called the three witnesses who were present at the Bruckner Boulevard gas station during the robbery: O'Hara, who drove into the gas station to ask for directions, and Ortiz and Martinez who worked at the station. None could identify Figueroa as having been involved in the incident. (Tr. 107, 138–40, 149–50, 162, 168, 170, 174–75, 202, 360, 371 & 374–75). O'Hara testified that he saw two people (Tr. 149–50); Ortiz testified that he saw two or three people (Tr. 158 & 166–67), but also that he saw

three or four (Tr. 177–78); and Martinez gave conflicting testimony on whether four or five people were involved (Tr. 215, 288, 305, 362–63 & .374–75). To add to the confusion, in the course of questioning Martinez, Rivera's attorney and the People intimated that four people were involved. (Tr. 363, 374–75).

The three police officers who arrived at the scene after the crime and who arrested the defendants were also unable to inculpate Figueroa. Police officer Joseph Monteleone, who arrested Bermudez on October 16, 1980, two weeks after the incident, found him in the front passenger seat of a tan Chevrolet that fit the description of the second robbery car. Police officer Monteleone recovered a .38 caliber handgun from the car, (Tr. 405–09), and an empty holster for the .38, both fitting the description of the weapon taken by the robbers from William Hendricks, the owner of the gas station who was shot and killed. (Tr. 414, 416–18). Petitioner was not with Bermudez on the night Bermudez was arrested. (Tr. 429–30). Police officer James Dungan, who assisted officer Monteleone in arresting Bermudez, testified to the same effect. (Tr. 434–39). Upon objection by Figueroa, the Court admitted the .38 caliber handgun and the holster recovered from Bermudez against Bermudez only and gave a limiting instruction to the jury. (Tr. 452–53). The third police officer, John Corcoran, arrived at the gas station soon after the robbery and shooting took place, and gave general testimony concerning the scene of the crime, also without inculpating Petitioner. (Tr. 482–83).

The People also called a ballistics expert and a forensic pathologist to testify about the bullet that was extracted from William Hendricks, and that the cause of death was a gunshot wound to the chest. (Tr. 734–39, 870–76, 880 & 882). However, the bullet, a .22 caliber, was too deformed to enable the ballistics expert to determine the specific weapon from which it had been fired. (Tr. 740–41). Finally, the prosecution called William Hendricks' wife to iden-

tify him and his .38 caliber revolver. (Tr. 614–15).

## 2. *The Defendants' Statements*

The Court, after having denied defendants' motions for separate trials, redacted the statements by replacing the names of the co-defendants with non-specific phrases like "one guy," "a guy," "the other guy" or "another guy." (Tr. 510–23). Unfortunately, however, the context of the references, and the manner of use during trial, made it clear that Petitioner's name was the name that had been redacted; thus, the very purpose of the redaction was compromised.

### a. *Rivera's First Statement*

The first statement the People introduced into evidence was given by Rivera to the detective in charge of the investigation, John Farrell. (Tr. 524–28). Before the statement was introduced, the Court instructed the jury that the statement was being offered against Rivera only, and that the statement should not be considered against Bermudez or Petitioner. (Tr. 528–29). The Court noted that Rivera's statement referred to other people and that the jury should not attempt to speculate who were those other people: "It's not your concern whether or not [Rivera] was talking about the other persons involved in this trial...." (Tr. 529). The Court then gave the following additional instruction:

> Now, one other thing. Normally when a statement the officer testifies from his memory as to the statement. I am making an exception here and the officer will be permitted to read the statement. The reason I have done that is because what I have just mentioned to you a few moments ago, relating to other persons, and he is being permitted to testify only to the statement made by Rivera, without regard to other persons, even though the expression "other guy" or "other persons" will be used, and that's

the only reason the detective will be permitted to read his statement.

(Tr. 529).

Detective Farrell then read Rivera's statement to the jury. The statement began with Rivera's admission that he and his co-defendants intended to commit the robbery: "We were driving around and decided to stick up the gas station." (Tr. 530). Continuing, Rivera admitted that he was driving a stolen 1972 brown Oldsmobile, (Tr. 530), and that "one guy" had a 9 millimeter handgun and "another guy" had the .22 caliber revolver stolen from O'Hara's car. (Tr. 530). Rivera claimed not to have had a gun. (Tr. 530). Rivera was standing at the driver's side of his car, while "one guy and Tony were taking the safe out of the office...." (Tr. 531).

At this point, the Court interrupted Detective Farrell's reading, and instructed the jury why "Tony" had not been replaced by "a guy."

> Let me stop you there, Officer. You heard the officer use the word "Tony." Tony is not one of the defendants in this case, that's the reason his name is being used. All right.

(Tr. 531). Detective Farrell clarified that "Tony" referred to "Tony Colon." (Tr. 531).

Rivera's statement then described the shooting of Hendricks, how Rivera and Colon fled in Rivera's car, while "[o]ne guy and another guy" fled in the red Vega, (Tr. 532), and that "one of the guys" took Mr. Hendricks's gun. (Tr. 533). Rivera stated that "[m]e, two others and Tony" committed the robbery (Tr. 533), that while he was waiting near his car, "[o]ne guy was in the office with the other two guys [and that] the other two guys were getting the safe" (Tr. 533); and that one guy shot Mr. Hendricks with the .22 caliber revolver found in O'Hara's car. (Tr. 533).

Later, during Detective Farrell's redirect by the prosecutor, the following exchange took place:

Question: Did [Rivera], during the course of the statement, give you names of specific perpetrators?

Mr. Zapata: Objection.

Mr. Marshall: Objection.

Mr. Bruce: Objection

The Court: Don't answer that question Officer.

Mr. Marshall: I reserve an application.

The Court: That question is not to be asked again or anything similar to it, sir.

(Tr. 552–53).[3]

After Detective Farrell's testimony, Bermudez moved for a mistrial, arguing that the Court's previous instruction to the jury regarding use of Colon's name and the prosecutor's question prejudiced Bermudez's rights:

The district attorney's question to the police officer, although it wasn't answered, as to whether or not the defendant Rivera named specifically the other people who were allegedly with him at this time, taken together, your Honor, with your previous instruction to the jury, while the detective was reading the statement concerning why Tony's name remains in because he is not a defendant in this case, I think the two taken together, your Honor, will require any juror who was paying attention and hear, to come to the conclusion that this defendant, my client's name was named, was in the statement, and is no longer in the statement because he is a defendant in this case, whereas Tony Colon is not a defendant in this case, and that's why his name still appears in the statement.

(Tr. 556–57). Petitioner joined the motion, arguing that "the inference to the jury is such that it becomes a jigsaw puzzle, just by a mental deduction they can then come to a conclusion that the names that are not mentioned are the names of the defendants." (Tr. 558). The Court denied the

motions, but addressed only the point about the prosecutor's question, not the Court's prior instruction to the jury:

When that question was asked the Court immediately told the witness not to answer it and admonished the assistant district attorney and directed that no such question or similar question be asked. I believe the correction was prompt, on the scene, so to speak, and no prejudice resulted. Motion for a mistrial denied.

(Tr. 557).

Later, Detective Farrell was recalled, and the prosecutor sought to mark for identification a written copy of Rivera's statement. (Tr. 640). The Court, in the jury's hearing, commented, "I believe you have it, I have a photocopy of it, mine is an unredacted copy." (Tr. 641). Rivera's and Bermudez's attorneys moved for a mistrial, but the Court denied the motion, commenting, "I told them yesterday certain changes were made in the statement by me to eliminate what I considered material that shouldn't be in there. They were told that yesterday." (Tr. 644). Petitioner's attorney pressed and argued that "[t]he Court cannot ever tell the jury that any changes have been made" to a confession, (Tr. 644). The Judge replied, "[t]hat was told to them yesterday" and "[t]he jury knew about this all along." (Tr. 645).

### b. *Rivera's Second Statement*

The People introduced a second statement made by Rivera, in the form of his testimony before the grand jury. The prosecutor again argued against redaction, urging that *Bruton* did not apply "when one defendant makes a statement which another defendant also makes, where they each refer to the other." (Tr. 561). The Court again rejected the argument, reasoning that "[i]t is more than that. It is more than just referring to the other. It

---

3. Mr. Marshall was Bermudez's attorney, Mr. Zapata was Rivera's attorney and Mr. Bruce represented Petitioner.

is where the statements are substantially the same." (Tr. 561). The prosecutor pressed further, and argued that the statements were "duplicative in their description of crucial facts." (Tr. 562). Petitioner countered and urged that his several statements, although admitting his presence at the scene of the robbery, did not amount to an admission that he was a participant in the robbery, whereas Rivera's statements clearly inculpated him. (Tr. 561, 562–3). The Court ordered that Rivera's grand jury testimony could be redacted to avoid prejudice, and could then be read to the jury. (Tr. 563).

Thus, the jury heard from Rivera's out of court grand jury testimony, that "the guy" in his car and "the other two guys" from the second car robbed the gas station and ordered Rivera to be a lookout, (Tr. 767), and that Rivera wanted nothing to do with the robbery but was forced at gun point to serve as a lookout (Tr. 767–68). Rivera admitted to driving around in a brown and white '72 Oldsmobile with his girlfriend in the early morning hours, and that after dropping off his girlfriend and getting "a joint or something," he met "with three guys" (or "these guys," the transcript is unclear). (Tr. 769–772). Rivera, continuing somewhat inconsistently, stated that he saw "[o]ne guy and another guy named Tony Colon," and that "one of the guys" suggested that they drive around. (Tr. 772–73). Rivera and "one guy" then followed the red Vega and Colon to the gas station. (Tr. 773). Rivera claimed that the guy in his car did not have any weapons, and that one guy told Rivera to wait while Colon and the two other guys got out of the car and walked into the gas station (Tr. 778). Rivera then stated that a guy called him into the station, that he saw the two attendants sitting in chairs, and that one guy, who had a nine millimeter pistol, told Rivera to serve as a lookout. (Tr. 778). Colon, Rivera said, did not have a gun and, apart from the nine millimeter, he saw no other guns. (Tr. 778).

According to his statement, Rivera was outside the station office, near the gas pumps, and "the other guys" were inside. (Tr. 779). After about ten minutes, "one of the guys" told Rivera that they were going to put a safe in Rivera's car and to drive his car into one of the gas station bays. (Tr. 781–82). William Hendricks, the gas station owner, then pulled into the station, (Tr. 783), and Rivera saw "a guy" hit Hendricks in the head with a gun and saw "one guy" shoot Hendricks. (Tr. 784). Rivera also saw Hendricks reach for his gun and fire a shot. (Tr. 784). After the shooting, "one guy" ran outside and told Rivera to "get out of here." (Tr. 785). Rivera and Colon then drove off together. Rivera dropped off Colon, and drove home. (Tr. 785–86).

The next day, one of the guys got in contact with Rivera and told Rivera that "another guy" had placed a box with a shotgun inside Rivera's car. (Tr. 786). The shotgun belonged "to the other guy." (Tr. 786). Rivera testified that he did not know the box was in the car, but that during the preceding evening he saw one of the guys with a box. (Tr. 787). Although Rivera claimed to have been forced at gun point to serve as a lookout by a man he described as a "drug addict" and "maniac," Rivera willingly drove to one guy's house the day after the shooting to return the box with the shotgun inside. (Tr. 788).

#### c. *Petitioner's First Statement*

On November 15, 1980, Detective Farrell and his partner, Detective Adalberto Riquelme, took the first of three statements from Petitioner. (Tr. 616–19). Again, the prosecutor argued that Rivera's statements interlocked with Petitioner's, (Tr. 579), and again the Court rejected the argument and redacted Petitioner's statements (Tr. 579). And, as before, the Court instructed the jury:

> Again, in view of the extended conference between the Court and counsel, as I ruled yesterday as well, the officer will be permitted to read from the State-

ment rather than from memory; is that correct, counsel?.

(Tr. 619). Counsel did not object. (Tr. 619).

Petitioner's first statement, a brief one, began with the admission that "[w]e met at someone's house," left with "one guy," returned to Petitioner's home, found that Petitioner's wife was not there, and "went back to one of the guy's houses." (Tr. 619–20). Then, with Petitioner in "another guy's car" and Colon "in the other guy's car," and one car following the other, the two cars arrived at the gas station. (Tr. 620). Petitioner stated that the others "decided to stick up the gas station," but Petitioner "told them [he] did not want any part of it." (Tr. 620). Petitioner stated that he left "the guy's car" and walked across a nearby bridge. (Tr. 620). After Colon and the two other guys finished robbing the gas station, Petitioner stated that "one guy" picked him up. (Tr. 620). Two days later, Petitioner saw "two of the guys" and asked if someone had been shot at the gas station. One of the guys responded, "I don't know. I don't know." (Tr. 620).

### d. *Petitioner's Second Statement*

Twenty minutes later, still in the police station, Petitioner gave a second statement. (Tr. 624). Petitioner now stated that when he went with the three guys to the gas station, he "knew they were going to stick it up." (Tr. 624). Petitioner told his friends that he did not want to go into the gas station, but "one guy" "told me to shut up." (Tr. 624–25). "One guy and Tony" then went into the gas station's office and both of them had guns. (Tr. 625). Petitioner withdrew from the scene and went, not to a nearby bridge as he had claimed in his first statement, but to the back of one of the bays in the gas station:

I went all the way into the back of the bay. I never had a gun, I didn't shoot anyone. I was in the back and I heard a shot so I ran and got into the car with another guy.... I know I was there and

was part of it, but I did not shoot anyone and I never had a gun. Man, I don't even know anything about guns, I never had one in my life and you got to believe that. I swear to God on my kid and I never shot anyone.

(Tr. 625). In answer to the detective's question, Petitioner answered that "[t]here were four of us," including "Tony Colon," and that one of the guys told him that Colon had fled to Puerto Rico. (Tr. 625, 627).

At the gas station, Petitioner saw that "[a] guy had a nine millimeter and Tony had a big long gun, I think it was a 45." (Tr. 627). Petitioner said that "[s]omeone hit [Hendricks] with the nine millimeter and [Hendricks] fired a shot. I heard clapping like an automatic trigger being pulled without one in the chamber," and a "kid" got hit in the hand, and that he heard another shot, perhaps three shots in all. (Tr. 628–629). Petitioner got into a car and left with another guy. (Tr. 628–29). The detective asked Petitioner about the "sawed-off rifle," and Petitioner said it "was in the other car." (Tr. 629).

### e. *Petitioner's Third Statement*

Petitioner gave a third statement that night, to an Assistant District Attorney. Petitioner stated that "me and two guys, and [Tony] Colon" went to the station and bought some stuff. (Tr. 708). Petitioner was in "one guy's car" and Colon was in the other car. (Tr. 708–09). Petitioner stated that he was in the "back of the station," "back by the far end of the corner." (Tr. 709). Someone came into the station, and Colon "snatched" him and brought him to the back of the station. (Tr. 709). Colon and "another guy" both had guns, and Petitioner, although not seeing anyone get shot, heard two shots go off. (Tr. 709–10). Petitioner then tried to further distance himself from the critical events:

I ran out, I ran outside, you know, I didn't, I didn't want nothing to do with

it, you know. I was there, so I am involved as it is, I am telling the truth, that's why I asked for this.

(Tr. 710). Petitioner got into "another guy's car," and Colon and "the other guy" got into "the red car." (Tr. 710).

Petitioner stated that he did not know there was going to be a robbery, and saw the guns for the first time when Colon showed one inside the gas station. (Tr. 711–12). Petitioner's statement to the Assistant District Attorney continued:

Question: And what did you do?

Answer: Also, myself, I went inside.

Question: You went inside the main part of the station?

Answer: No, no, I went to the back.

Question: And what did you do in the back?

Answer: I was just hiding, you know, because I was there, you know, and I didn't have no place to go, you know. I was just involved because I didn't want to go inside personally, I didn't want to go inside.

Question: Did you ever tell anybody that?

Answer: Yes.

Question: Who did you tell?

Answer: I told one guy this, I told him not to go in there hisself [sic].

Question: You told him not to go inside?

Answer: Hisself [sic] personally.

Question: Did, did—who was the one who mentioned, did anybody mention about robbing the place?

Answer: No, because we both was in two different cars.

Question: Both of you took different cars?

Answer: Yes, I was in one car and Colon and another guy in another car.

Question: So, no one mentioned at any time to you they were going to rob the place.

Answer: No, sir.

(Tr. 711–12). Continuing further, and discussing the events at the gas station after they returned the second time, Petitioner stated:

Answer: ... I was telling him in the car to not 'get involved, to not get involved. He told me to shut up.

Question: So you followed the other car into the station?

Answer: Yes, sir.

Question: And you are saying that one guy and Colon went in first with guns and you said you waited in the back area?

Answer: Well, I went in the gas station because I told one guy, let's go, I am going to tell you the sincere truth, Officer, I told him I don't want to be no part of this and I didn't. I only had seven dollars in my pocket to my name, that's it. I didn't touch no register, no safe, I didn't even see a safe to tell you the truth.

(Tr. 713).

At this point, O'Hara and Hendricks each drove into the station. (Tr. 714). Colon took O'Hara to the back of the office, and Petitioner continued to try to distance himself:

Question: How far away from you, from [O'Hara] were you at the time, were you close, were you far away?

Answer: No, I was in the corner, I—I was trying to get out, to tell the truth. I mean, I was trying to take—

Question: Well, did you say to Colon to leave this guy alone or anything?

Answer: No, I told another guy, let's go, I don't want to be involved.

Question: Did you say anything to anyone else?

Answer: No, sir, they were hanging out separately, that was the whole thing, you see, a guy followed him, he followed him and they went in the gas station. They went in the gas station and Colon got out, you know, walked straight in, another guy after him. Then a guy was arguing, see, there was a misunderstanding inside the gas station between me and a guy.

Question: What do you mean, misunderstanding?

Answer: What I mean is that I told him I didn't want to get involved, I told him I want to go home.

Question: And what did he say?

Answer: He told me to shut up.

(Tr. 715). Petitioner said that he heard two gun shots, and the noise from someone trying to fire a gun without bullets, but he was "in the far end of the gas station" and could not see what was happening inside the office. (Tr. 716–17).

#### D. *Bermudez's Testimony*

After the People rested and motions to dismiss the indictments were denied, Bermudez elected to testify in his defense. (Tr. 921–22). Bermudez testified that he was asleep at home during the time that the robbery took place, that he made dinner for himself, took a walk around his neighborhood and went to sleep around 12:00 or 12:30 a.m. (Tr. 926–28). Bermudez testified that he did not own a red Vega, that he did not have a driver's license and that he had never met Ortiz and Martinez. (Tr. 929–30).[4] In short, he denied having participated in the robbery. (Tr. 930).

On cross-examination, Bermudez denied owning the .38 caliber revolver that was found in the car where he was arrested, or

the holster that was found on his person. (Tr. 953–56). Bermudez testified that he and Petitioner had been friends "for a couple of years," (Tr. 963), but denied having called Petitioner or having asked him to alert Bermudez's girl friend, Idalia Martinez or "Chickie." (Tr. 958). Bermudez testified:

Q: Do you remember calling up Carlos?

A: No.

Q: Carlos Figueroa?

A: No.

Q: And telling Carlos to tell Chickie to go to the house because the cops were going to come?

. . .

A: I requested a phone call, but they denied the fact for me to make a phone call. I wanted to call my lawyer.

(Tr. 959). Petitioner's attorney chose not to question Bermudez. (Tr. 1043). The People, through detective Farrell, rebutted Bermudez's denial that he was not at the scene, and elicited that, after he was arrested, he called Rosa Martinez, Petitioner's mother, and told her, "Tell Carlos to go over to Chickie's and get the stuff." (Tr. 1059–60).

#### E. *The Summations*

##### 1. *Petitioner's Summation*

The summation on behalf of Petitioner, although disjointed and rambling, argued that Petitioner did not participate in the crime at the gas station, that no witness placed him there, that there was no evidence that he possessed a gun, and that his statement that he had argued with the perpetrators was corroborated by the testimony of a witness. (Tr. 1158–71). Counsel argued that Bermudez's phone call to Petitioner's mother was not incriminating vis-a-vis Petitioner, (Tr. 1153–54, 1170 &

---

4. Martinez identified Bermudez in a lineup and in Court. (Tr. 213–14, 218, 256, 269, 271 & 275).

1172), and that the lack of evidence against Petitioner explained why the police did not arrest Petitioner until five to six weeks after the robbery (Tr. 1150–1154).

### 2. The People's Summation

The prosecutor argued that Petitioner's statements established his presence at the robbery and that the eye witnesses saw the perpetrators acting in concert. (Tr. 1215). Furthermore, he said, the statements of Petitioner and Rivera tied into each other. Quoting from Rivera's statement, the prosecutor told the jury that "one guy," the phrase inserted by the trial judge in place of the redacted names, actually referred to Petitioner: [5]

> "Answer: I was standing at the driver's side of my car and one guy and Tony, Tony and me and one guy were taking the safe out."

> That one guy, I submit, Carlos Figueroa, because [Bermudez] was in the office.

(Tr. 1245). Thus, the prosecutor, by telling the jury that "guy" stood for Figueroa, undid the very purpose of the redaction, to prevent one co-defendant's statement from inculpating another. Continuing, the prosecutor told the jury that "one guy" in Rivera's statement meant Figueroa, and "another guy" meant Bermudez:

> "He [Mr. Hendricks] didn't go down, he pulled a gun. I heard a shot, I think he fired. I saw *one guy* ducking down behind my car." *Carlos Figueroa.* "Behind my car. He got up, looked and then I hear another shot...." "One guy and another guy went to the red Vega." *Raymond Bermudez.* "But one of the guys left his keys behind and had to go back in." Raymond Bermudez.

(Tr. 1246–1252) (prosecutor's summation reading Rivera's statement). Turning to Petitioner's statements, the prosecutor again filled in the blanks for the jury:

> "One guy and Tony went in, they both had guns. The other guy and I went into the bay." That's Carlos [Figueroa] and Hector [Rivera].... "I heard a shot so I ran and got into the car with another guy." Hector Rivera.

(Tr. 1249). And, again:

> "Question: Name the guys who were with you?"

> "Answer: Well, there were four of us."

> Again, four, him [Petitioner], Raymond [Bermudez], Hector [Rivera], Tony Colon....

(Tr. 1250).

### F. The Verdicts

Initially, the jury returned a verdict of guilty against Rivera and Bermudez only, finding them guilty of murder in the second degree. (Tr. 1336–38). The jury reported that it had not reached a verdict as to Petitioner and, to aid its deliberations concerning Petitioner, requested Rivera's grand jury testimony and Petitioner's third statement. The Court allowed a read-back of Petitioner's statement, but refused to provide the jury with Rivera's statement, instructing that the evidence was not relevant because the jury had already returned a verdict against Rivera. (Tr. 1338–39). The jury then returned a verdict of guilty of murder in the second degree against Petitioner. (Tr. 1342). The Court sentenced Petitioner to twenty-five years to life. (Sentencing Tr. 17).

### G. Petitioner's Appeal to the Appellate Division

On appeal to the Appellate Division, Petitioner, represented by the same attorney who had represented him at trial, raised only one ground of error: the trial court's refusal to honor the jury's request for a read-back of Rivera's statement. (*See* Brief for Appellant, Ex. 3 to Petitioner's

---

**5.** In the following passages, the quoted material is from the prosecutor's reading of the defendants' statements, and the material not in quotation marks is the prosecutor's own comments during summation.

Appendix in Support of Petition for Habeas Corpus ("Pet.App.")). Petitioner's counsel argued that Rivera's statement that Petitioner did not carry a weapon on the night of the robbery would have helped Petitioner's defense. (*Id.* at 5). Counsel was apparently not concerned that Rivera's statements inculpated Petitioner in the robbery, regardless whether Petitioner carried a gun. Petitioner's counsel also failed to argue that Petitioner's constitutional rights were prejudiced, in violation of *Bruton v. United States, supra,* by the trial court's flawed redactions of Rivera's and Bermudez's out-of-court statements, and by the prosecutor's improper summation over-riding whatever benefit the flawed redactions provided.

The prosecutor opposed Petitioner's appeal, arguing that the trial court had ruled properly in not permitting Rivera's statement to be read back to the jury after the jury had delivered its verdict against Rivera. (*Id.* at 16).

Indeed, in view of the court's earlier instruction to the jury, that Rivera's grand jury testimony, from which all references to appellant and co-defendant Bermudez had been redacted, should only be considered as evidence against Rivera, and that the jury was not to speculate concerning Rivera's references to any other persons (T. 1296), it is obvious that the jury's consideration of this evidence, at this juncture, would have been inappropriate, and that, therefore, the court's response was proper. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

(*Id.* at 18). Implicitly, the prosecutor's appellate brief conceded the impropriety of the prosecutor's summation in the trial court. If, as the appellate brief stated, "the jury was not to speculate concerning Rivera's references to any other person," and the jury's "consideration of [such] evidence ... would have been inappropriate" (*Id.*), the prosecutor should not have argued, in summation, that "one guy" meant Figueroa, and that "another guy" meant Bermudez.

By memorandum order dated June 18, 1985, the Appellate Division denied the appeal and affirmed the judgment of conviction. (Pet.App.Ex.2). Petitioner's attorney did not seek leave to appeal to the New York Court of Appeals. (*See* Petition ¶ 10).

## H. *Petitioner's Writ of Coram Nobis*

Some ten years later, new counsel for Petitioner filed a writ of coram nobis in the Appellate Division, First Department, alleging that Petitioner's appellate counsel had rendered ineffective assistance and that Petitioner should be released from custody because: (1) the admission and inadequate redaction of Rivera's statements violated *Bruton;* and (2) the admission of Bermudez's statement, and the prosecutor's cross-examination of Bermudez, denied Petitioner a fair trial. *See* Pet.App.Ex. 16. By Order dated January 21, 1997, the Appellate Division denied the writ without elaboration, but with citation only to *People v. De La Hoz,* 131 A.D.2d 154, 158, 520 N.Y.S.2d 386 (1st Dep't 1987), *appeal dismissed,* 70 N.Y.2d 1005, 526 N.Y.S.2d 940, 521 N.E.2d 1083 (1988).[6] *See* Pet.App.Ex. 1.

---

**6.** The Order of the Appellate Division does not discuss *De La Hoz.* However, its citation to page 158 of the decision suggests its concern with frequent claims of ineffective assistance of counsel:

In conclusion, we note the ever burgeoning number of applications which raise a claim of ineffective assistance of appellate counsel. The burden lies with those raising the issue to rebut the presumption that counsel has been effective. The mere existence of

an unraised issue will not suffice. A defendant must show that had the issue been raised a greater likelihood would exist that the judgment would have been reversed, or at least, modified. The right of appeal only guarantees review, not reversal.

131 A.D.2d at 158, 520 N.Y.S.2d at 388. The case at bar is different. In *De La Hoz,* Petitioner argued that the brief filed by his attorney on direct appeal was "woefully inadequate," lacking "reference to even a single

## II. *The Standard for Habeas Review*

Petitioner filed this action on April 23, 1997, seeking relief under 28 U.S.C. § 2254, on the ground, *inter alia*, that the admission of Rivera's statement, and their flawed redaction violated his Sixth Amendment rights under *Bruton.* Under recent amendments to the governing law as provided by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner must show that his conviction was obtained in violation of clearly established Federal law, as determined by the United States Supreme Court. Section 2254(d), as amended, provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

My inquiry, therefore, focuses on whether Petitioner's judgment of conviction is inconsistent with Federal law, as determined by the United States Supreme Court, as of June and July, 1981, the date of trial.[7]

## III. *Federal Law, as Determined by the Supreme Court, at the Time of Trial*

Federal law regulating the use of out-of-court statements of one co-defendant to prove the culpability of another co-defendant was developed prior to June 1981 in two decisions of the United States Supreme Court: *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979).[8]

---

citation of authority." But the brief was 42 pages long, with multiple citations to various sources, contained detailed discussion of the relevant authority, and Petitioner had himself submitted a copy of the brief in connection with a habeas application. *Id.,* 131 A.D.2d at 156–57, 520 N.Y.S.2d at 387–88. The instant petition raises serious issues of a Constitutional magnitude, unlike the clearly meritless arguments raised in *De La Hoz.*

7. For purposes of this opinion, I accept, without deciding, Respondent's argument that I should apply the most deferential standard of review of Petitioner's judgment of conviction; namely, that *Bruton* issues present mixed questions of fact and law and that the trial court's legal decisions are to be reviewed under a standard of reasonableness, not de novo, and that the trial court's factual findings are to be presumed correct. *See Ramirez v. Senkowski,* 7 F.Supp.2d 180, 191 (E.D.N.Y. 1998) ("[Congress] concluded that as a matter of the sound administration of justice a Federal habeas court faced with a mixed question of law and fact decided by the State court should decline to issue the writ unless the State trial and appellate courts have unreasonably applied constitutional principles clearly established by the Supreme Court.").

8. A district judge, reviewing a judgment of conviction delivered by a state court, must apply "clearly established Federal law [then existing], as determined by the Supreme Court of the United States." Thus, Figueroa's conviction in 1981 is to be reviewed according to its consistency with *Bruton,* as the trial judge endeavored to do. Although I have considered cases decided after 1981, I have done so for their illumination of the meaning of *Bruton,* and not as independent sources of law. A decision of a court should generally be considered, not as the fresh creation of law, but rather as the application of Constitution, statutes and case-precedents to new fact patterns in the light of reason and experience. *See* ANDREW L. KAUFMAN, CARDOZO 205 (1998).

> Cardozo's aim in the [Storrs] lectures [of 1921, later to be published as *the Nature of the Judicial Process* ] was to give a practical answer to the question, "What is it that I do when I decide a case?" · Cardozo saw the judge's task as twofold. "[H]e must first extract from the precedents the underlying principle [of law]· ... he must then determine the path or direction along which the principle is to move and develop, if it is not to wither and die." The· idea was that the judge needed to understand the reason why particular prior cases were decided as they

In *Bruton*, two defendants, Evans and Bruton, were jointly tried for armed postal robbery. At their trial, Evans's confession was introduced into evidence. Evans confessed to having committed the crime, and his confession also directly inculpated Bruton. Evans did not take the witness stand. The trial court instructed the jury that Evans' confession could be used only against Evans, and that the jury should disregard the references to Bruton. *See id.* at 124–25, 88 S.Ct. 1620. Notwithstanding this instruction, the Supreme Court held that the admission of Evans' confession violated Bruton's Sixth Amendment right to confront the witnesses testifying against him. *See id.* at 126 & 136–37, 88 S.Ct. 1620. The Court reasoned that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. 1620. Thus, the Supreme Court held, a limiting instruction cannot cure the prejudice that results from admitting a co-defendant's out-of-court confession into evidence; the "risk" to the other defendant "is so great," "and the consequences of [jury] failure so vital," as to require a new trial.

In *Parker*, the Court divided four to four on whether an interlocking confession—a confession of one defendant that "interlocks" with the confession of another—could create an exception to *Bruton*. Four Justices held that there was an exception.[9] They reasoned that *Bruton* excludes out-of-court confessions because they are devastating, even in the context of limiting instructions by the trial judge. If, however-

er, the defendant's case "has already been devastated" because of the defendant's own confession, the exclusionary rule of *Bruton* can serve no purpose and the out-of-court confession of the co-defendant may be admitted. *Parker*, 442 U.S. at 75 & n. 7, 99 S.Ct. 2132. Four other Justices held that introduction of a non-testifying co-defendant's confession is always a violation of the Sixth Amendment, but that the error may, in some cases, be harmless where the defendant confessed. *See id.* at 77–80, 99 S.Ct. 2132.[10] In *Parker*, five Justices agreed that the error was harmless and, on that ground, affirmed the conviction five votes to three.[11]

As I discuss below, I hold, as did the trial court, that Petitioner's three statements did not "interlock" with Rivera's two statements, and that the trial court's flawed redactions of Rivera's statements implicated Petitioner in the gas station robbery and murder in violation of *Bruton*.

## IV. *Petitioner's Statements Were Not Interlocking*

 Not all statements made by a defendant are confessions, and not all confessions are interlocking simply because co-defendants make separate confessions regarding the same charged conduct. A confession is an admission of guilt; confessions are "interlocking" if they overlap by describing critical events in a substantially similar way without significant discrepancies. *See Parker*, 442 U.S. at 67–68, 99 S.Ct. 2132 (confessions could be deemed interlocking because they "clearly demonstrated the involvement of each, as to crucial facts such as time, location, felonious activity, and awareness of the overall plan or scheme") (internal quotation

---

were and then to decide whether the principles that governed earlier situations should still apply.
A mathematician, in extrapolating a value that is not known from that which is, can be said to perform a like function.

9. Chief Justice Burger, Justice Rehnquist, Justice Stewart and Justice White. Justice Powell did not participate in the decision.

10. Justice Stevens, Justice Brennan, Justice Marshal and Justice Blackmun.

11. Justice Blackmun produced the five-vote majority. *See Parker*, 442 U.S. at 80–81, 99 S.Ct. 2132.

marks and citation omitted); *id.* at 76 n. 8, 99 S.Ct. 2132 (defendant's statement that "Tennessee was an easy place to commit a robbery" held not to be an interlocking confession because "[t]his extrajudicial statement, while inculpatory, was by no stretch of the imagination a 'confession'" (quoting and discussing *Roberts. v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968))). Later decisions that applied *Bruton* and *Parker* are to similar effect. *See, e.g., Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ("If those portions of the co-defendant's purportedly 'interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, where the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted."); *Holland v. Scully,* 797 F.2d 57, 66 (2d Cir.), *cert. denied,* 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986) (interlocking confessions must be "substantially the same and consistent on the major elements of the crime involved" and "identical on all key points"); *United States v. Fritz,* 476 F.2d 37, 39 (2d Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973) (interlocking confessions must be the

same "[a]s to motive, plot and execution of the crime").[12]

█ The trial court correctly held that Petitioner's statements did not interlock with the statements of Rivera or Bermudez. Although Petitioner's statements are not altogether consistent as to his presence in the vicinity of the robbery, Petitioner throughout maintained his opposition to, and lack of participation in, the intention of some or all of the others to rob the gas station. (Tr. 620, 624–25, 710, 711–12, 713 & 715). The others, Petitioner stated, told him to "shut up." (Tr. 713 & 715). Rivera's statements, in contrast, inculpate all, Petitioner included. Thus, Rivera's first statement begins: "We were driving around and decided to stick up the gas station." (Tr. 530). I hold that Petitioner's statements are not confessions and are not interlocking.

Respondent argues that Petitioner's second statement, where he stated that he "knew they were going to stick it up" (Tr. 624), and his second and third statements, where he admitted presence but not participation (Tr. 625) (Tr. 710), constitute confessions of guilt. I disagree; they do not. Presence, without function or intent to participate, is not enough. There is no material overlap between Petitioner's and Rivera's statements.

The prosecutor's argument of "interlocking" confessions was properly rejected by

12. *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), closed the exception for interlocking confessions left ajar by the four-to-four vote of the Justices in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), discussed *supra. Cruz* held that the rule of *Bruton* was violated if any out-of-court confession of one co-defendant was admitted against the other, even if the confessions interlocked.

The Second Circuit, before *Cruz,* had allowed interlocking confessions to be admitted; after *Cruz,* the Second Circuit ruled that it could do so no longer, even where the judgment of the State court had preceded *Cruz.* The Second Circuit held that the rule of *Bruton* was so fundamental that *Cruz* was to be given this retroactive effect. *Graham v.*

*Hoke,* 946 F.2d 982 (2d Cir.1991), *cert. denied,* 502 U.S. 1039, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992).

Respondent argues that AEDPA requires that I apply Federal law as it existed in 1981, at the time of the State court judgment, for that was the Federal law "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254, *supra.* In other words, Respondent argues, I am to follow the law in the Second Circuit prior to *Graham v. Hoke,* permitting interlocking confessions to be admitted.

Respondent's argument is academic. The trial court ruled that Petitioner's statements, and Rivera's and Bermudez' confessions, were not interlocking. I accept that finding as correct.

the trial court. (Tr. 14). As the trial court ruled, *Bruton* is not avoided merely because one statement refers to the other. "It is more than that. It is more than just referring to the other. It is where the statements are substantially the same."

I come now to the redactions of Rivera's out-of-court statements, and their inculpation of Petitioner.

### V. Admission of Rivera's Confession Violated Bruton

■ If a confession is redacted so that it does not inculpate co-defendants, *Bruton* is not implicated, for the redacted confession proves the guilt only of the party who gave it. *See, e.g., Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("[W]e continue to apply Bruton where we have found that its rationale validly applies," citing *Cruz v. New York, supra*). That assumes, of course, that the redaction sufficiently masks the identities of co-defendants.

In the case at bar, the trial court told the jury that Rivera's confession had been redacted in order to mask the identity of co-defendant Figueroa; thus, the name of Tony Colon, the fugitive, had not been redacted. [Tr. 531]. However, Judge Learned Hand observed years before *Bruton* was decided,

> [T]here could not have been the slightest doubt as to whose names had been blacked out.... [E]ven if there had been, that blacking out itself would have not only laid the doubt, but underscored the answer.

*United States v. Delli Paoli,* 229 F.2d 319, 321 (2d Cir.1956), *affirmed,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), overruled by *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[13]

*Bruton* itself has been applied to void convictions by improperly redacted confessions of non testifying co-defendants for, as in *Bruton,* no matter the limiting instruction, the "devastating" nature of the hearsay proof cannot dependably be kept from mind by the jury. In *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), for example, the co-defendant's confession was redacted by reading "blank" rather than the petitioner's name. As the Supreme Court held, the jury was not fooled, for the name of the defendant was easily substituted.

> Redactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications or alteration, however, leave statements that, considered as a class, so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result.

*Id.,* at 1152. Indeed, the Supreme Court went on, "By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation—once the jurors work out the reference." *Id.;*[14] *cf. United States v. Kyles,* 40 F.3d 519, 526 (2d Cir.1994), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1419, 131 L.Ed.2d 302 (1995) ("[A] redacted confession runs afoul of *Bruton* only if it standing alone, would clearly inculpate the [non-declarant] without intro-

---

**13.** The Court of Appeals divided two-to-one in affirming Delli Paoli's conviction of conspiring to sell, and selling, illicit alcohol. Judge Hand considered the possibility of innocence "too remote for serious discussion" (*Id.* at 320), and did not pass on the admissibility of the co-defendant's confession; Judge Medina, concurring, believed that the jury could follow the trial judge's limiting instruction (*Id.* at 322); and Judge Frank, dissenting, expressed the view that the Supreme Court eventually adopted in *Bruton* (*Id.* at 323).

**14.** *Gray v. Maryland* did not create law. It was but an application of the rule of *Bruton* to a factual pattern similar to that of *Bruton.* *See* note 8, *supra.* I cite *Gray v. Maryland* and other cases decided after 1981 to illuminate the rule of *Bruton.* The trial court's judgment of conviction against Figueroa was "contrary to," and "involved an unreasonable application of, clearly established Federal law" as of 1981, "as determined by the Supreme Court of the United States."

duction of further independent evidence.") (internal quotation marks and citation omitted); *United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990) ("[A] redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names . . . may be admitted without violating a codefendant's *Bruton* rights."); *United States ·v. Wilkinson,* 754 F.2d 1427, 1435 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985) (finding no *Bruton* error where "there was no reason for the jury to believe· that anything had been redacted"). In this case, the redaction failed and the jury was aware that Rivera's confession inculpated Petitioner.

 The trial court committed serious and repeated error by informing the jury that Rivera's statements were redacted. Prior to the introduction of Rivera's first statement, the Judge instructed the jury that Rivera's statement referred to other people and that the jury should not speculate whether Rivera "was talking about the other persons involved in this trial." [15] (Tr. 529). The Court then instructed the jury as follows:

> Now, one other thing. Normally when a statement the officer testifies from his memory as to the statement [sic!]. I am making an exception here and the officer will be permitted to read the statement. The reason I have done that is because what I have just mentioned to you a few moments ago, relating to other persons, and he is being permitted to testify only to the statement made by Rivera, without regard to other persons, even though the expression "other guy" or "other persons" will be used, and that's the only reason the detective will be permitted to read his statement.

(Tr. 529). In other words, according to the trial judge, the officer was allowed to read the statement to make sure that he did not identify the persons whose identities were cloaked by substituting references to "other persons." Unfortunately, however, the trial court's instruction gave the jury the very information that the trial court wanted to keep from the jurors; the jury could readily infer from the fact of redaction that "other guy"· meant Petitioner.

Later, the trial judge commented in open court that he possessed an "unredacted" copy of Rivera's statement. Defendant Bermudez and Petitioner moved for a mistrial, arguing that it was improper for the court to tell the jury that an out-of-court confession was changed, or redacted. (Tr. 644). ·The Court denied the motion, and commented: "I told them yesterday certain changes were made in the statement by me to eliminate what I considered material that shouldn't be in there. They were told that yesterday. . . . The jury knew about this all along." (Tr. 644–45).

As one of the officers read Rivera's first statement, the Court ·interrupted to tell the jury that the officer had read Tony Colon's name as a participant in the event because Colon was not on trial: . . ·

> Let me stop you there, Officer. You heard the officer used the word "Tony." Tony [Colon] is not one of the defendants in this case, that's the reason his name is being used. All right.

(Tr. 531). Thus, the jury knew that the references to "one guy" and "other persons" in Rivera's out-of-court confession were to Petitioner and co-defendant Bermudez. Minutes later, that was confirmed, as Rivera's confession specifically named four: Colon, himself and "two others:"

> Question: How many of you were there at the station?

15. As *Bruton* held, a cautionary instruction cannot cure the prejudice caused by admitting an out-of-court confession of a co-defendant. 391 U.S. at 135, 88 S.Ct. 1620. If the

redaction lets the jury know that which is to be kept from the jury, the error cannot be cured by a cautionary instruction.

Answer: Me, two others and Tony [Colon].

(Tr. 533). Thus, the jury knew, from the trial court's redactions and the trial court's instructions explaining the redactions, that Rivera's confession inculpated Petitioner.

The error in this case was aggravated by the fact that it flowed from an instruction to the jury from the Court. When a court addresses a jury on a point of law, the court's instructions carry important weight, for the jury is focused on what the judge instructs and has sworn an oath to follow the court's instructions. *See Richardson*, 481 U.S. at 206, 107 S.Ct. 1702 (referring to "the almost invariable assumption of the law that jurors follow their instructions"). And the error was compounded, reinforced each time the jury heard the name of Colon or the references to "one guy."

Moreover, the prosecutor made certain that the jury knew explicitly what it surely knew implicitly. Thus, the prosecutor asked the officer who had recorded Rivera's confession whether Rivera "gave you names of specific perpetrators?" (Tr. 552). Although timely objections were made and sustained, the prosecutor's suggestive question reinforced the error already made by the Court. Undismayed, the prosecutor underscored his improper suggestion in summation. Repeatedly, the prosecutor quoted from the redacted references of "one guy" and "another guy" and, not stopping there, actually told the jury for whom those references stood. (Tr. 1245, 1246, 1249, 1250 & 1252). An example illustrates the point: [16]

"He [Mr. Hendricks] didn't go down, he pulled a gun. I heard a shot, I think he fired. I saw one guy ducking down behind my car." *Carlos Figueroa.* "Behind my car. He got up, looked and then I hear another shot...." "One guy and another guy went to the red Vega." *Raymond Bermudez.* "But one of the

guys left his keys behind and had to go back in." *Raymond Bermudez.*

(Tr. 1246) (emphasis added). And, finally, as if the error thus far was not sufficient, the prosecutor specifically identified the four individuals referred to throughout the redacted statements:

"Question: Name the guys who were with you?"

"Answer: Well, there were four of us."

Again, four, him [Petitioner], Raymond [Bermudez], Hector [Rivera], Tony Colon....

(Tr. 1250).

The trial court intended, by redactions, to avoid prejudice that, under *Bruton*, violates the Sixth Amendment. Unfortunately, those very redactions created a Sixth Amendment violation.

## VI. *The Bruton Violation was Harmful Error*

██ Not all *Bruton* violations justify granting a petition for habeas corpus. The error must be harmful; it must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Because it is "virtually impossible to determine whether a jury did or did not ignore an inculpatory statement," courts review "a host of other factors" to determine whether *Bruton* errors were harmful, *Latine v. Mann,* 25 F.3d 1162, 1167 (2d Cir. 1994), among them:

the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, and the

---

**16.** Again, in this and the following passage, the quoted material represents the prosecutor's read back of the redacted statements, and the material not in quotation marks is the prosecutor's own comment during summation.

overall strength of the prosecution's case.

*Id.* (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). In addition, the court "must also consider the nature and content of the defendant's own statement, in particular, 'whether it satisfactorily explains his or her part in the crime without reference to the co-defendant's statement.' " *Samuels v. Mann,* 13 F.3d 522, 527 (2d Cir.1993) (citation omitted), *cert. denied,* 513 U.S. 849, 115 S.Ct. 145, 130 L.Ed.2d 85 (1994). "The strength of the prosecution's case is probably the single most critical factor." *United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993) (*per curiam* ).

█ Applying this standard here, I find that the error was harmful. None of the dozen witnesses called by the prosecution could place Petitioner at the scene of the robbery. Nor was there any physical evidence linking Petitioner to the crime: he was not carrying a weapon when he was arrested; his fingerprints were not found on any of the weapons used in the shooting; and nothing left at the scene implicated him. Although Petitioner's own statements placed him at the scene, it is as a person not wishing to be present and not taking part in the criminal activities of the others. Such evidence is not sufficient to excuse a violation of *Bruton.* See *Holland v. Scully,* 797 F.2d 57 (2d Cir.), *cert. denied,* 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986) (*Bruton* error held harmful where, in a felony murder case, Petitioner's statement did not admit inducing co-defendants to commit the crime nor did Petitioner admit to participating in the planning of the crime); *Cotto v. Mann,* 991 F.Supp. 124, 132 (E.D.N.Y.1998) (*Bruton* error held harmful where Petitioner's statements did not show awareness of a planned robbery or agreement to participate or facilitate robbery). Rivera's state-ments, improperly redacted by the court and commented on by the prosecutor, were the sole evidence establishing Petitioner's complicity in the robbery and shooting. Without such evidence, the record is inadequate to show that Petitioner knowingly and willfully participated in the robbery or shooting.

Significantly, the jury requested a read back of Rivera's grand jury testimony *after* it returned a guilty verdict against Rivera, and while still considering the case against Petitioner. (Tr. 1338). Although the Court refused to provide Rivera's statement, explaining that it was not relevant against Petitioner (Tr. 1338–39), the damage had already been done. As *Bruton* holds, the prejudice arising from the admission of a co-defendant's out-of-court confession cannot be undone by a limiting instruction. *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620 ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").[17] There is no reasoned basis to believe that the Court's last instruction avoided error where the previous instructions so clearly failed.

## VII. *Petitioner Exhausted His State Court Remedies*

█ "[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). A Petitioner who seeks to upset his state conviction on federal grounds "must first have given the state courts a fair opportunity to pass upon his federal claim," pursuing his claim to the highest State court capable of reviewing the matter. *Daye v. Attorney*

---

**17.** Ironically, in opposing *Petitioner's* argument on direct appeal that the trial court erred in not reading back Rivera's statement, the *People* argued that to have done so would have violated *Bruton. See* Pet.App.Ex. 4 at 18. Essentially, this is the same point that Petitioner makes here.

*General of the State of New York,* 696 F.2d 186, 190 n. 3 & 191 (2d Cir.1982) (en banc). Section 2254(b) of title 28 codifies the requirement:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
> (A) the applicant has exhausted the remedies available in the courts of the State....

28 U.S.C. § 2254(b)(1)(A). As the Supreme Court held just this last term, the rule reduces the "friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999) (alteration in original).

Here, Petitioner's brief on direct appeal to the New York State Appellate Division failed to raise the *Bruton* issue, and Petitioner failed to seek leave to appeal to the New York Court of Appeals. Petitioner did not, therefore, exhaust the procedures available on direct review with respect to the *Bruton* issue. Nonetheless, Petitioner's coram nobis application addressed the *Bruton* issue in the context of raising his claim of ineffective assistance of appellate counsel. *See* Pet.App.Exs. 14–16. The issue, therefore, is whether raising the *Bruton* issue in the context of an ineffective assistance of counsel claim in a coram nobis proceeding satisfies the exhaustion requirement. For the reasons that follow, I hold that it does.

The courts of this circuit have recognized that raising issues on coram nobis that were not raised on direct appeal can satisfy the exhaustion requirement. *See, e.g., Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981) (where a Petitioner has not exhausted his claims on direct appeal, Petitioner "must utilize available state remedies for collateral attack of his conviction in order to satisfy the exhaustion requirement" (citing *Johnson v. Metz,* 609 F.2d 1052, 1055–56 (2d Cir.1979) (instructing habeas Petitioner who did not fairly present claim in the course of his direct appeals to proceed by filing a motion to vacate judgment pursuant to N.Y.Crim.Proc.Law § 440.10))); *Bellavia v. Fogg,* 613 F.2d 369, 371 & n. 3 (2d Cir.1979) (holding that claims not raised on direct review were nonetheless exhausted because they had been raised in a coram nobis motion); *Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir.1977) ("In order to meet the exhaustion requirement, a Petitioner must have presented his claim to the state courts at least once, on direct or collateral review."); *DaCosta v. Mitchell,* No. 95 Civ. 1667(JG), 1996 WL 1088898, at *2 (E.D.N.Y. Dec.12, 1996); *Sanford v. Senkowski,* 791 F.Supp. 66, 69 (E.D.N.Y.1992). A leading treatise in this area summarizes the point well:

> As long as the petitioner pursued a claim throughout a "full round" of state postconviction proceedings—*i.e.,* as long as she takes advantage of the available trial-court postconviction procedures and appeals any adverse trial-court rulings to as many courts as state law requires to adjudicate an appeal—the claim will be considered exhausted *even though it was not raised at trial and/or on direct appeal.* Of course, this rule presupposes that the petitioner correctly followed the state postconviction procedure.

2 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 23.3b, at 883 (3d ed.1998) (emphasis added).

Here, Petitioner's writ of coram nobis raised an ineffective assistance of appellate counsel claim that encompassed the *Bruton* issue and was indeed predicated directly on it. The Appellate Division denied that application on January 21, 1997. *See* Pet.App.Ex. 1. A writ of

coram nobis is the proper means of raising a claim of ineffective assistance of appellate counsel. *See Mathis v. Hood,* 851 F.2d 612, 614–15 (2d Cir.1988) (citing *People v. Bachert,* 69 N.Y.2d 593, 599, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987)). And, because an order of the Appellate Division denying a writ of coram nobis is not appealable to the New York Court of Appeals, Petitioner has given the highest state court capable of addressing the issue an opportunity to do just that. *See, e.g., Ramirez v. Headley,* No. 98 Civ. 2603(RWS), 1998 WL 788782, at *4 (S.D.N.Y. Nov.10, 1998); *Garcia v. Keane,* 973 F.Supp. 364, 369–70 (S.D.N.Y.1997); *see also O'Sullivan,* 119 S.Ct. at 1734 ("[N]othing in our decision today requires the exhaustion of any specific state remedy when a State has provided that that remedy is unavailable"). Thus, Petitioner has exhausted the available remedies with respect to his claim of ineffective assistance of appellate counsel. The lingering issue is whether exhausting a claim of ineffective assistance of appellate counsel that subsumes a *Bruton* issue also exhausts the *Bruton* issue. For the reasons that follow, I hold that it does.

▉ In order to satisfy the exhaustion requirement, a habeas Petitioner must have "fairly presented" the federal claims to the state courts. *See, e.g., Picard,* 404 U.S. at 275, 92 S.Ct. 509. The Court of Appeals addressed this requirement at some length in its en banc opinion in *Daye:*

In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court. Specifically, he must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.

Likewise, the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition. The chief purpose of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court.

696 F.2d at 191–92 (citations omitted). Particularly relevant here is the requirement that the Petitioner place before the state court "essentially the same legal doctrine" as raised in the habeas application. *Id.; see also Fielding,* 548 F.2d at 1107 (characterizing the requirement as imposing a burden to present the "substantial equivalent" of the federal claim); *Steele v. Walter,* 11 F.Supp.2d 252, 256 (W.D.N.Y. 1998) (Petitioner must raise "substantially the same legal doctrines"). The Court of Appeals in *Daye* elaborated on this requirement and noted that it does not mean that "there can be no substantial difference in the legal theory advanced to explain an alleged deviation from constitutional precepts" and that the important point is that the state courts be given an opportunity to pass on the "substantial equivalent" of the habeas claim. 696 F.2d at 192 & n. 4.

▉. Petitioner was represented by his current attorneys in the coram nobis proceedings. He raised there all of the issues that he raises here, but in a different format. In the coram nobis, he argued that his appellate counsel was ineffective because he failed to raise the *Bruton* issue, and because the *Bruton* error was harmful. The papers submitted in the coram nobis, containing a detailed 58 page factual affidavit, set out all the factual matters raised again in this habeas petition, *see* PetApp.Ex. 15. Similarly, Petitioner's 42 page memorandum of law in the coram nobis proceeding contained a detailed discussion of *Bruton* and the redaction issue, the very issues at the heart of this habeas petition. *See* Pet.App.Ex. 16. That the *Bruton* issue was raised incident to the argument of ineffective assistance of counsel does not negate that the issue was fully

raised. Petitioner argued that his appellate attorney was ineffective precisely because he failed to raise the *Bruton* violation on his appeal. The law requires that the issues presented to the State courts be "substantially equivalent" to the issues raised in the federal habeas proceeding, and that is clearly the case. I therefore hold that Petitioner has adequately exhausted his remedies in the New York State courts.

## VIII. *The Petition is Timely*

Petitioner was convicted on July 8, 1981, and he filed this habeas petition on April 23, 1997, some sixteen years later. Respondent contends that the petition is untimely because: (1) it is barred by the AEDPA's statute of limitations provision, *see* 28 U.S.C. § 2244(d); and (2) it is barred by the doctrine of laches, *see* Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rule 9(a)"). For the reasons that follow, I hold that the petition was timely filed and is not barred by limitations or laches.

■ In light of *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998), decided after Respondent filed his brief, Respondent's argument based on the statute of limitations is rejected. In *Ross,* the Court of Appeals held that for convictions that became final prior to the effective date of the AEDPA, April 24, 1996, habeas Petitioners have one further year from that date to file their petitions, that is, until April 24, 1997. *See id.* at 98 & 103. Petitioner filed this petition, his first, on April 23, 1997, one day before the last day to file a petition. The petition is, therefore, not barred by AEDPA's statute of limitations.

I now turn to examining the issue of laches. Under Habeas Rule 9(a):

A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the Petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

Habeas Rule 9(a).[18] As the Advisory Committee Notes emphasize, laches is an equitable defense, and a decision to dismiss on that ground lies in the sound discretion of the court. *See Hill v. Linahan,* 697 F.2d 1032, 1035 (11th Cir.1983). The Respondent must "(1) make a particularized showing of prejudice, (2) show that the prejudice was caused by the Petitioner having filed a late petition, and (3) show that the Petitioner has not acted with reasonable diligence as a matter of law." *Walters v. Scott,* 21 F.3d 683, 686–87 (5th Cir.1994); *see also Hill,* 697 F.2d at 1035; *Honeycutt v. Ward,* 612 F.2d 36, 41–42 (2d Cir.1979), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2969, 64 L.Ed.2d 843 (1980); *Hughes v. Irvin,* 967 F.Supp. 775, 779 (E.D.N.Y.1997); *Moseley v. Scully,* 908 F.Supp. 1120, 1130 (E.D.N.Y.1995), *aff'd,* 104 F.3d 356 (2d Cir. 1996).[19] Significantly, delay alone is not a bar to relief. *Walters,* 21 F.3d at 687; *Moseley,* 908 F.Supp. at 1130 (citing *Strahan v. Blackburn,* 750 F.2d 438, 443 (5th Cir.), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2683, 86 L.Ed.2d 700 (1985)). As then District Judge Sotomayor commented, the

---

**18.** As the Court of Appeals noted in *Ross,* enactment of AEDPA's statute of limitations does not eliminate the defense of laches under Habeas Rule 9(a). *See Ross,* 150 F.3d at 103.

**19.** As many courts have noted, Habeas Rule 9(a), as originally drafted, created a rebuttable presumption of prejudice in favor of the state for all petitions filed more than five years after the judgment of conviction. Prior

to passage, the House Judiciary Committee eliminated this requirement, reasoning that " 'it is unsound policy to require the defendant to overcome a presumption of prejudice....' " *Moseley v. Scully,* 908 F.Supp. 1120, 1130 (S.D.N.Y.1995) (quoting H.R.Rep. No. 1471, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S.C.C.A.N. 2478, 2481); *see also Hughes,* 967 F.Supp. at 779.

defense must be applied "flexibly," in order

> to prevent a Petitioner from unfairly disadvantaging the state by delaying adjudication of his habeas claims until witnesses are unavailable, memories stale, and evidence difficult to produce. The ultimate concern of this rule is that adjudications under a habeas petition be fair and accurate.

*Rodriguez v. Artuz,* 990 F.Supp. 275, 279–80 (S.D.N.Y.) (citations omitted), *aff'd,* 161 F.3d 763 (2d Cir.1998). The State, if it claims prejudice, must show prejudice in terms of experiencing difficulty in responding to the petition, and not to the potential of retrying the Petitioner. *See Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) ("Congress has not seen fit ... to provide the State with an additional defense to habeas corpus petitions based on the difficulties that it will face if forced to retry the defendant."); *Walters,* 21 F.3d at 687; *Moseley,* 908 F.Supp. at 1130.

■ Respondent has failed to make the particularized showing necessary to support its defense of laches. Respondent has not shown prejudice in its ability to respond to the petition. Nor is there any suggestion of prejudice in connection with a possible retrial. The prosecutor lacked witnesses and evidence to prove a case against Petitioner in 1981, and points to no additional proofs that might have been available to him since that time—even assuming that prejudice in connection with a retrial is a relevant factor to a defense of laches. *Vasquez v. Hillery, supra.* The violation of *Bruton* that is the basis of this petition is clear from the trial record and does not require a hearing or the submission of further proofs. I therefore hold that the defense of laches has not been shown.

### CONCLUSION

For the reasons stated, the petition for a writ of habeas corpus is granted. Respondent shall release Petitioner from custody unless, within 30 days from the date of this Order, the People announce their intention to retry Petitioner or notice an appeal to the Court of Appeals.

SO ORDERED.